### SACRAMENTO SUBURBAN FRUIT LANDS CO. v. MacNAIR. *

Circuit Court of Appeals, Ninth Circuit. December 17, 1929.

No. 5722.

Butler, Van Dyke & Desmond, of Sacramento, Cal., and Edward P. Kelly, of Minneapolis, Minn., for appellant.

Ralph H. Lewis and George E. McCutchen, both of Sacramento, Cal., for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge. In its general background the case is like Sacramento Suburban Fruit Lands Co. v. Melin (No. 5671) 36 F.(2d) 907, this day decided. The contract which appellee alleges he was fraudulently induced to make was executed February 3, 1920. This suit, brought to recover damages for the alleged fraud, was commenced more than 8 years thereafter, namely, on March 5, 1928. In its answer appellant averred that the cause of action was barred

*Rehearing denied February 10, 1930.

by subdivision 4 of section 338 of California Code of Civil Procedure, which provides that an action for such relief must be brought within 3 years from the "discovery, by the aggrieved party, of the facts constituting the fraud." At the close of all the evidence it moved for a directed verdict upon this and other grounds, and to a denial of the motion it took exception.

The question we consider is whether, or not, upon the evidence, it should be held as a matter of law that the statute had run. Plaintiff testified that he was 40 years old, had been a farmer all of his life, and that in the latter part of 1919 and the early part of 1920 he was living on a farm near Winnipeg, Canada. At that time he had never been in California and knew nothing about California lands or their value, or the raising of fruit. He was endeavoring to sell his farm in Canada through an agent by the name of Stock, who about that time also became agent for the appellant. Stock interested him in the Rio Linda project, and, upon certain representations made to him as to the value of the land and its availability for fruit growing, he signed an application to purchase a tract and made a deposit thereon of $50. Before executing the contract in question he came to Sacramento, in January, 1920, where he stayed about three weeks. He was shown the project and the adjacent country and observed surface conditions and such orchards and vegetation as were growing thereon, and thereupon he signed the contract in question, by the terms of which he agreed to purchase one of the tracts or subdivisions. He moved from Canada to California and took up his residence on the land in 1923. He at first went into the poultry business and in 1924 set out 2 fruit trees and, either in that year or the following, about 40 more. He watered them, but they died the year they were set out, or the next year. He never put out more than 42 fruit trees. He had a well drilled in 1923 to a depth of 86 feet and was present during the time the drilling was going on. He also saw what looked like hardpan when he dug a septic tank in December, 1924; it was near the surface; he said that it was a hard substance, but he did not then know what it was, and he made no inquiry of any one. He did not examine the rest of the land to see if there was any more upon it. He testified that he intended to raise fruit, but did not connect the formation with fruit raising, and did not make inquiry or ask anybody. He did not put in the fruit trees himself, did not know how deep they were set, and up to the time of the trial he did not know the depth

of the soil generally on the tract. He then thought it was 29 inches, and that information he had got only three or four days before the trial. Though many settlers had come upon the project and were developing their holdings, he never talked with any one about fruit growing or the hardpan or the other conditions of the soil; nor did he ever talk with any realtor or banker touching the value of the land. From his letters and testimony it is to be inferred he is a man of good intelligence.

Upon being interrogated as to whether or not he believed fruit could be raised, he answered he had not thought about fruit at all in 1924.

"Q. When did you first think about fruit? A. I thought about it at the end of last year.

"Q. Is that the first time you thought about raising fruit on this land? A. Oh, no, but the first time I devoted my mind to fruit since I have been here.

"Q. That is the first time that you gave any attention to whether fruit would grow on your land or the land generally in the colony? A. Yes, I was interested in fruit, but I had not the money to go into fruit. In 1924 I believed that fruit could be successfully raised, but I had not concentrated my mind on it, not only on my land but in the colony generally. I first discovered that fruit could not be raised at the end of last year or the beginning of this year."

On cross-examination there were shown to him certain letters which he identified as having been written by him. Of these, one is dated at Rio Linda, November 30, 1923, and was evidently written to Stock, with whom, apparently, he kept up some correspondence. In it, among other things, he stated: "Everything has developed tremendously here lately; houses and hen houses are being built all around. Poultry seems to be the dividend producers; fruit growing seems to me worse than waste of time, with one or two possible exceptions. I hope you have had a successful season; I have met several of your 'Victims.' I wrote Grinkley about selling ½ my acreage, & he said he would write you; he practically turned it down. If I weren't 'broke' I would not want to sell, as we both like the property; the Company have nothing that can compare with it for a homesite. Rio Linda property does not appeal favorably to either of us; the air seems different and clearer in Haggin Park."

In another of the letters, dated at Sacramento, December 18, 1924, he said:

"I wish you and yours a very happy real Christmas and a prosperous New Year.

952

"To return to business with oil prospects about three to one in favor, Grinkley's (supposed to look) generous condescension did not appeal to me. If I sell at all I would not sell the oil rights; they would have to be reserved and legally and absolutely ours.

"Not only is it true that the company sold as high as 400, but also for $450, fully paid up, just across the creek where it cost the buyer a small fortune to get the power line put up.

"As for the Free Press letter, I'm sorry I can't refute the article; although I would be only too willing to help you in your sales, the best I can say is that the chicken business is profitable; otherwise, I don't think that Mr. B. exaggerated much; most of the R. L. land which is for sale, is poor, in my opinion & fit only for poultry in its present state. It's true that it can be made, but it's costly & not remunerative. Fruit can be bought far cheaper than raised, except berries."

Upon redirect examination the court permitted him to testify that, by the statement in the letter of December 18th, "most of the Rio Linda land which is for sale is poor, in my opinion, and fit only for poultry in its present state," he meant "what was left for sale." And upon the further question put to him by his counsel, "Is only fit for poultry in its present state—what did you mean by that?" he answered, "I could not recollect what was meant there, at all."

Later he was recalled by his counsel, and, his attention having been directed to the letter of November 30, 1923, in response to leading questions he testified that he meant by the exceptions "fruit growing seems to me worse than a waste of time, with one or two possible exceptions," "cherry trees and some other trees, cherries and oranges, and one or two things like that."

"Q. Did you know at this time, Mr. MacNair, that this land was not adapted to fruit raising? A. You mean my particular piece of land?

"Q. Yes. A. No.

"Q. You did not know that? A. That was in 1923, was it?

"Q. You say here, 'I have met several of your victims,' what did you mean by that? A. Oh, that was a little bit of a side joke of mine. Referred to the people that he sold to."

When asked upon cross-examination what he meant in his letter of December 18, 1924, by his reference to refuting some article in the Winnipeg paper, he testified:

"He (Stock) sent me an article from the Winnipeg paper. I don't know who it was by. I have forgotten all about it. 'Mr. B.' must have been the signer of the article. It was about trying to keep people from coming to California, that they were getting swindled around Rio Linda and Sacramento. Mr. Stock sent me that article and he asked me to write a letter refuting that.

"Q. And that is what that meant in that letter? A. I suppose that is what is meant by 'victims.'"

In the Melin Case we have discussed the character of the alleged representations made by the defendant and the extent to which they may be deemed to constitute actionable fraud. Though without experience in fruit raising, plaintiff was an intelligent, practical farmer and undoubtedly had knowledge of the importance of soils in the production of crops, whether grain or fruit. He contends that he bought the property primarily for fruit raising purposes, and yet, if we accept his almost incredible testimony, we find that he lived on the project for years without making any serious effort to raise fruit and without seeking by examination of his land or inquiry to determine its availability for such use or its value, market or otherwise. This notwithstanding the fact that what he called "tremendous" development was going on all about him and his admitted knowledge that some of the lands were worthless for such purpose. Significant, we think, is some of his testimony above quoted. He was asked, "Did you know at this time (November 30, 1923), Mr. MacNair, that this land was not adapted to fruit raising?" He was careful to limit the extent of this question by his answer, "You mean my particular piece of land?" And upon being assured that that was the meaning, his answer was in the negative. Apparently he thus took care not to say that he did not know that other lands upon the project were not adapted to fruit raising. But even more conclusive against him is the fact, as shown by his letter of December 18th and his testimony in respect thereto, that he had knowledge, at least that early, that a public claim was being made that defendant was engaged in a swindle in the sale of the lands. That was over four years before he commenced his suit. At that time, if not before, we think he was put on inquiry. To hold otherwise would be in effect to nullify the statute of limitations. True, he might then have been unable to determine *conclusively* that the land was not the best fruit land, but that is because the issue is of such character that it is not subject even now to conclusive proof. If he could escape the operation of the statute upon that ground, without peril he could have waited indefinitely to bring this action.

We think the denial of the motion for di-

rected verdict upon this ground was error, and accordingly the judgment will be reversed, with directions to grant a new trial.